DECISION
{¶ 1} Relator, Cynthia Light, seeks a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying relator's application for permanent total disability ("PTD") compensation and to enter a new order granting said compensation.
 {¶ 2} Relator's claim stems from work-related injuries suffered on four different occasions arising from her employment as a bus driver transporting handicapped children for the Clermont County Transit Board. Claim No. PEL42988 was allowed for "neck, right arm, and right shoulder" injuries occurring on January 10, 1986. Claim No. PEL51582 was allowed for "contusion to left side of head, chest, right shoulder strain, legs and low back strain, headache" suffered on September 26, 1986. Claim No. PEL77748 was allowed for "spasm of the neck and right shoulder" which occurred on March 15, 1989. Relator's most recent injury, claim No. PEL81076, occurred on July 21, 1989 and was allowed for "strain neck, strain left wrist, strain low back, strain right shoulder and neck; dysthymic disorder."
 {¶ 3} Relator filed a claim for PTD compensation on May 14, 1996. She was examined by commission neurologist, Michael Valle, D.O., for injuries to her head allowed in claim No. PEL51582. Dr. Valle determined that relator was not capable of sustained remunerative employment based upon a non-allowed chronic pain syndrome.
 {¶ 4} Relator was examined by orthopedic surgeon, Kenneth R. Hanington, M.D., on February 28, 1997. Dr. Hanington opined that relator was capable of returning to her former employment as a bus driver.
 {¶ 5} Psychologist, Lee Howard, Ph.D., examined relator on April 11, 1997 for her allowed dysthymic disorder. Dr. Howard noted in his occupational assessment that relator could return to her former employment and that she was capable of performing sustained remunerative employment. In his report, Dr. Howard opined that relator could perform even complex tasks. However, she would be limited to low and moderate stress range employment. Dr. Howard was deposed on September 26, 1997.
 {¶ 6} Relying upon reports by Drs. Hanington, Valle, and Howard, a staff hearing officer ("SHO") denied relator's request for PTD on August 28, 1998.[1] Relator filed a writ of mandamus with this court in case No. 99AP-722. Relator argued that Dr. Howard's report and deposition were internally inconsistent and did not constitute some evidence upon which the commission could rely. We agreed and granted a limited writ ordering the commission to conduct further proceedings. The Supreme Court of Ohio affirmed in State ex rel. Light v. Indus.Comm. (2001), 90 Ohio St.3d 522 on January 10, 2001.
 {¶ 7} An SHO vacated the commission's August 28, 1998 order and ordered relator to submit to a second psychological exam on March 7, 2001 by psychologist Norman L. Berg, Ph.D. Dr. Berg noted that relator suffers from crying spells whenever she becomes frustrated. Additionally, relator related a tendency to doze off. During the course of the examination, relator indicated that she was not being treated by a physician for her depression nor was she taking medication for her dysthymic disorder. Furthermore, relator opined that continued psychological treatment and medication were not necessary. Dr. Berg concluded that relator had reached maximum medical improvement ("MMI") and assessed a 20 percent permanent impairment as a result of her dysthymic disorder. However, he opined that relator could return to her former employment and perform sustained remunerative employment.[2]
 {¶ 8} Dr. Berg was deposed on August 10, 2001. During his deposition, Dr. Berg noted that he did not inquire into the exact number of crying spells relator averaged in a given week. However, he did not believe that, at the time of the examination, relator's crying spells were as frequent as reported by Dr. Howard. Dr. Berg further noted that relator did not indicate that her tendency to fall asleep posed a significant obstacle to future employment.
 {¶ 9} An SHO conducted another hearing on September 28, 2001. Relying upon the reports submitted by Drs. Hanington, Valle, and Berg, the SHO again issued an order denying relator's claim for PTD on May 8, 2002. On July 22, 2005, relator filed a second writ of mandamus alleging: (1) the commission abused its discretion when it relied upon Dr. Berg's report because it was similar to Dr. Howard's report; (2) the commission abused its discretion when it relied upon Dr. Berg's report because the report was equivocal and internally inconsistent; and (3) the commission abused its discretion when it relied upon Dr. Valle's report.
 {¶ 10} Pursuant to Civ.R. 53(C) and Loc.R. 12(M) of the Tenth District Court of Appeals, this matter was referred to a magistrate of this court. The magistrate rendered a decision on May 10, 2006, including findings of fact and conclusions of law. (Attached as Appendix A.) Based upon his application of the case law to these facts, the magistrate found that the reports of Drs. Berg and Valle constituted "some evidence" upon which the commission could rely. The magistrate recommended that this court deny relator's claim for PTD compensation.
 {¶ 11} For a writ of mandamus to issue, relator must exhibit a legal right to relief from the determination of the commission and that the commission has a legal duty to provide such relief.State ex rel. Pressley v. Indus. Comm. (1967),11 Ohio St.2d 141. A claimant is entitled to relief where the claimant demonstrates that the commission abused its discretion by entering an order not supported by the evidence in the record.State ex rel. Elliott v. Indus. Comm. (1986), 26 Ohio St.3d 76. However, where some evidence in the record supports the commission's order, there is no abuse of discretion and mandamus will not lie. State ex rel. Lewis v. Diamond Foundry Co.
(1987), 29 Ohio St.3d 56.
 {¶ 12} In a claim for PTD compensation, a claimant must demonstrate a permanent inability to perform any sustained remunerative employment and relate that inability to the allowed claims. State ex rel. Jennings v. Indus. Comm. (1982),1 Ohio St.3d 101. Relator contended that Dr. Berg's deposition rendered his examination of relator equivocal and internally inconsistent and, therefore, may not be considered evidence of her ability to work.[3] State ex rel. Eberhardt v. Flxible Corp. (1994),70 Ohio St.3d 649; State ex rel. Lopez v. Indus. Comm. (1994),69 Ohio St.3d 445.
 {¶ 13} Relator bases her argument on perceived inconsistencies between Dr. Berg's report and deposition. Review of Dr. Berg's deposition does not reveal any disparities with his report. While Dr. Berg might have provided more detail in his report regarding relator's disorder, the lack of detail does not equate inconsistencies and disparities between the report and deposition. Extensive detail was not required before the commission could rely on Dr. Berg's opinion.
 {¶ 14} Relator's objections call into question the evidentiary weight of Dr. Berg's report and deposition. That is an assessment left entirely to the discretion of the commission.State ex rel. Teece v. Indus. Comm. (1981), 68 Ohio St.2d 165. We have authority to reweigh evidence considered by the commission only where it is clear that the commission abused its discretion. We find no such abuse in this case.
 {¶ 15} Relator further claimed that the commission abused its discretion when it relied upon Dr. Valle's report in the September 28, 2001 order. Relator argues that the commission rejected Dr. Valle's report in its original August 28, 1998 order. Therefore, Dr. Valle's opinion could not be relied upon in the September 28, 2001 order. State ex rel. Zamora v. Indus.Comm. (1989), 45 Ohio St.3d 17. (The commission may not rely upon a report that it previously rejected as unpersuasive.) The rule in Zamora does not apply to the facts herein. The commission specifically relied upon Dr. Valle's report and rejected only that portion regarding relator's non-allowed condition. Therefore, we find that the commission did not abuse its discretion by relying upon Dr. Valle's report.
 {¶ 16} Relator filed objections to the magistrate's recommendation on May 19, 2006, arguing essentially the same issues already considered by the magistrate. Relator argues that Dr. Berg's report may not be considered because of its similarity to Dr. Howard's report, a report previously found to be inconsistent by this court. Because Dr. Howard's report was eliminated as a basis for the previous ruling by the commission, relator now reasons that the commission was collaterally estopped from considering Dr. Berg's report. For the reasons already stated, we find the doctrine of collateral estoppel is not applicable in this case. Collateral estoppel only bars re-litigating of whether Dr. Howard's report was equivocal and internally inconsistent. Collateral estoppel does not bar consideration of Dr. Berg's report.
 {¶ 17} Pursuant to Civ.R. 53(E)(4), we have conducted a full review of the magistrate's decision, relator's objections and all submitted memoranda. For the foregoing reasons, relator's objections are overruled and we adopt the magistrate's decision. Relator's request for a writ of mandamus is denied.
Objections overruled; writ of mandamus denied.
Bryant and Whiteside, JJ., concur.
WHITESIDE, J., retired of the Tenth District Court of Appeals, assigned to active duty under the authority of Section 6(C), Article IV, Ohio Constitution.
 (APPENDIX A) IN THE COURT OF APPEALS OF OHIO TENTH APPELLATE DISTRICT
State of Ohio ex rel. Cynthia Light, :
Relator, :
v. : No. 05AP-771
Clermont County Transit Board : and Industrial Commission of Ohio, :
Respondents. :
 MAGISTRATE'S DECISION Rendered on May 10, 2006 Butkovich, Crosthwaite Gast Co., L.P.A., Stephen P. Gast
and Daryl A.W. Crosthwaite, for relator.
Jim Petro, Attorney General, and Lasheyl N. Sowell, for respondent Industrial Commission of Ohio.
 IN MANDAMUS {¶ 18} In this original action, relator, Cynthia Light, requests a writ of mandamus ordering respondent Industrial Commission of Ohio ("commission") to vacate its order denying her permanent total disability ("PTD") compensation, and to enter an order granting said compensation.
Findings of Fact:
 {¶ 19} 1. Relator has sustained four industrial injuries while employed as a bus driver. Her January 10, 1986 injury is allowed for "neck, right arm, right shoulder," and is assigned claim number PEL42988. Her September 26, 1986 injury is allowed for "contusion to left side of head, chest, right shoulder strain, legs and low back strain, headache," and is assigned claim number PEL51582. Her March 15, 1989 injury is allowed for "spasm of the neck and right shoulder," and is assigned claim number PEL77748. Her July 21, 1989 injury is allowed for "strain left wrist, low back, right shoulder and neck; dysthymic disorder," and is assigned claim number PEL81076. Relator's most recent industrial injury occurred while she was employed as a bus driver with Clermont County Transit Board. This injury occurred when a wheelchair lift broke with a passenger in the wheelchair. Relator was injured when she grabbed for the chair to prevent the passenger from falling.
 {¶ 20} 2. On May 14, 1996, relator filed an application for PTD compensation.
 {¶ 21} 3. On February 26, 1997, relator was examined at the commission's request by neurologist Michael Valle, D.O. Dr. Valle examined for the allowed conditions "contusion to left side of head" and "headache," in claim number PEL51582. Dr. Valle found no impairment for those allowed conditions. However, Dr. Valle opined that relator is not capable of sustained remunerative employment based apparently upon a nonallowed chronic pain syndrome.
 {¶ 22} 4. On February 28, 1997, relator was examined by commission specialist and orthopedic surgeon Kenneth R. Hannington, M.D. Dr. Hannington opined that the "orthopaedic allowances" permit relator to return to her former position of employment.
 {¶ 23} 5. On April 11, 1997, relator was examined by commission specialist and psychologist Lee Howard, Ph.D. Dr. Howard examined relator for her dysthymic disorder. In his narrative report, Dr. Howard states:
The claimant can perform in the simple, moderate, and complex task range. She can perform in the low and moderate stress range but not the high stress range. * * *
 {¶ 24} 6. Dr. Howard also filled out an occupational activity assessment report. The preprinted form poses the following two queries to the examining psychologist:
Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this claimant meet the basic mental/behavioral demands required: [1.] To return to any former position of employment? [2.] To perform any sustained remunerative employment?
Dr. Howard responded affirmatively to both queries.
 {¶ 25} 7. On September 26, 1997, relator's counsel took the deposition of Dr. Howard. The deposition was recorded and transcribed for the record.
 {¶ 26} 8. Following an August 28, 1998 hearing, a staff hearing officer ("SHO") issued an order denying relator's PTD application. The SHO's order relied upon the reports of Drs. Hannington, Valle and Howard to support the determination that the industrial injury medically permits relator to return to her former position of employment.
 {¶ 27} 9. On June 23, 1999, relator filed in this court a mandamus action which was assigned case No. 99AP-722.
 {¶ 28} 10. On March 28, 2000, this court issued a memorandum decision and judgment entry. Adopting this court's magistrate's decision, this court issued a limited writ of mandamus compelling the commission to vacate its order denying PTD compensation and to conduct further appropriate proceedings.
 {¶ 29} 11. On January 10, 2001, the Supreme Court of Ohio inState ex rel. Light v. Indus. Comm. (2001), 90 Ohio St.3d 522, affirmed the judgment of this court.
 {¶ 30} 12. In an order mailed March 7, 2001, pursuant to the judgment of the Supreme Court, an SHO vacated the SHO's order of August 28, 1998, and ordered that relator be scheduled for a psychiatric examination.
 {¶ 31} 13. On April 4, 2001, at the commission's request, relator was examined by clinical psychologist Norman L. Berg, Ph.D. In his narrative report, Dr. Berg writes:
EXAMINATION AND DISCUSSION:
* * * [Claimant's] daughter drove her to the office. This drive took over three hours, and Cynthia mentioned that because of sitting in the car for that length of time she was having discomfort throughout much of her body. The claimant is approximately 5'11'' tall and mentioned that she weighs "almost 500 lbs." She mentioned that when she quit working she weighed 350 lbs, and she feels she has gained weight because of inactivity and also because of the fact that she tends to overeat if she becomes nervous. She goes to bed by 9 pm and arises by 9-10 am. She mentioned that she has difficulty with sleep because of physical pain. She mentioned that she uses a hospital bed. She states that she feels tired almost all of the time. The claimant did not appear overly tired at the time of our evaluation which took place in the early afternoon. She mentioned that she often "dozes off."
The claimant appeared to have no difficulty with her hearing or vision. She wore eyeglasses. Her speech was relevant, coherent and clear. There was no pressure of speech, and volume of speech was normal. The claimant occasionally laughed and seemed psychologically reasonably comfortable with the evaluation process. Her memory processes appeared fairly good. The claimant states that she has had sporadic difficulty with memory for both recent and remote events over the past few years. The claimant mentioned that when she uses her arms and hands she has pain in the right shoulder. She is right-handed. She mentioned that with bending, stooping and lifting, she has pain in her back and right shoulder. She mentioned that after she sits for an hour she has pain throughout much of her body. She mentioned that at home she often sits in a recliner. The claimant walked in a slow manner and used a cane. During the evaluation she tended to place her right arm and hand on the table or on her cane. She seemed in slight discomfort from her back. She was able to maintain her attention and concentration. The claimant mentioned that she might take "100 Aleve tablets within a week." She also takes Rolaids for her stomach. She indicated that she has taken no prescribed medication in the past three months because she has not yet found a doctor in the Indianapolis area. She has lived there for the past three months. She mentioned that at times she does take Ibuprofen. She mentioned that previous to three months ago she was taking Paxil, medication for headache, and medication for her stomach. As just noted, the claimant is under no regular medical treatment but states she will soon find a physician.
Clinically, the claimant appeared to function in the low-average range of intelligence. She does know right from wrong, and she is able to understand the basic consequences of her actions. Her judgment and insight appear fairly good. The claimant was pleasant and cooperative throughout the evaluation. At no time was she hostile, aggressive or contrary. She did not present as significantly anxious, tense or nervous. When asked, she indicated that because of her pain she does not like to be in crowds. The claimant did not present as significantly depressed. When asked, she mentioned that she does feel somewhat depressed because of her physical pain and the fact that she cannot do her house cleaning to the extent she feels is necessary. She also mentioned that she cannot pick up her grandchildren because of her physical problems. She also mentioned that she feels depressed because she cannot work. The claimant mentioned that she will cry if she becomes frustrated. From what she relates it does not appear that she has frequent episodes of crying. She mentioned that approximately six years ago she accidentally took more of her pain medication than prescribed, but she states she has no history of self-destructive behavior or thoughts, and I do not consider her a risk at this time for such behavior. The claimant states that she has never been hospitalized for emotional/behavioral problem[s]. She mentioned that in 1987 she did attend a pain management program to help her deal with injuries sustained before the injuries addressed in the present report. The claimant mentioned that in the past she did receive counseling for approximately 4-5 years to help her cope with feelings of depression and to help her adjust with her physical injuries, but she states that she has had no such counseling in the past three years. She also indicated that she never received ongoing mental health counseling previous to the 1989 industrial injury. She mentioned that she was taking Paxil for approximately five years. She mentioned that the medication was of some help in relieving depression but also indicated that she prefers not to take medication. She then mentioned that she does take herbs to help enhance her mood. The claimant also mentioned that over the past several years she felt depressed because her daughter had leukemia, but she mentioned that the daughter's leukemia has now been in remission for the past four years.
The claimant's general orientation was satisfactory in that she knew the day, date, month, year, president and purpose of the evaluation. There was no evidence of either psychosis or underlying decompensation processes. At the time of our evaluation there was no indication of hallucinations, delusions, significant confusion, hyperactivity, exaggerated mood swings, or suspiciousness/paranoid ideation. From what I could determine it does not appear that the claimant has ever exhibited such features.
Clinically, the claimant exhibited no evidence of organic brain dysfunction. She has never had a seizure. She mentioned that she might occasionally drink wine but states she never had an alcohol problem. She stated that she does not use street drugs. She indicated that in the past she would take her medication as prescribed. When asked if she felt she needed any ongoing mental health counseling at the present time, Cynthia stated that she does not think this is necessary.
The claimant is able to wash, dress and attend to her personal hygiene needs but does so in a slow manner because of her physical limitations. She mentioned that she needs help with her shoes and socks. She mentioned that she cooks while sitting on a stool. She does very light cleaning. She does light laundry. She goes shopping with her daughter and needs to go to a store which has an electric cart which she uses to get around the store.
When asked how she spends her day, Cynthia mentioned that in the morning she lets the small pet dog go outdoors. She then puts the dog in a confined area. She watches television. She plays solitaire. She likes to read. She fixes one meal a day. Her daughter is away at work during the day. A sister might occasionally call her. When asked what difficulties she felt she would have if she tried to hold employment Cynthia stated "just babysitting is hard and I have to go to the bathroom about every 45 minutes." When asked, she mentioned that her general physical pain would prevent her from holding employment. When asked, the claimant indicated that she did not feel she had any major psychological condition which would prevent her from working but again emphasized that her physical health problems and her physical pain would prevent her from working.
During the mental status exam the claimant continued to be pleasant, cooperative and motivated. She functioned in a moderate to moderately slow manner. She was able to concentrate. She seemed in slight physical discomfort. * * *
* * *
OPINION:
These are my responses in regard to the specific questions posed by the Industrial Commission: In my opinion the claimant has reached maximum medical improvement in regard to her allowed condition of "Dysthymic Disorder." I rate the claimant as having 20% permanent impairment arising from the allowed condition of "Dysthymic Disorder." This would be in addition to any rating given for the other allowed conditions. Reference guide used is AMA Guide to Evaluation of Permanent Impairment, 4th Edition. In my opinion the allowed condition of "Dysthymic Disorder" would have mild impairment on the claimant's ability to acquire new job skills. The Occupational Activity Assessment form has been completed and is enclosed with this report. * * *
 {¶ 32} 14. Dr. Berg also filled out an occupational activity assessment form. The form asks the examining psychologist two questions:
Based on the impairment resulting from the allowed/alleged psychiatric/psychological condition(s) only, can this claimant meet the basic mental/behavioral demands required: [One] To return to any former position of employment? [Two] To perform any sustained remunerative employment?
Dr. Berg marked the "yes" response to both queries.
 {¶ 33} On the form, Dr. Berg wrote:
Claimant's allowed condition of "dysthymic disorder," in and of itself, does not prevent claimant from performing former position of employment (bus driver) or from performing other sustained remunerative employment. Claimant is able to understand and follow simple directions, and she is able to maintain attention and concentration while doing simple tasks or tasks of low moderate complexity. Claimant is able to relate adequately with others in a work setting although she mentioned feeling uncomfortable in a crowd. Overall, she functions in a moderately slow manner. Her psychological functioning is at a moderate pace, but her physical functioning is moderately slow. Psychologically, claimant is able to sustain her level of activity. Her ability to cope with routine job stress is mildly impaired by her above-noted allowed condition. The claimant's allowed condition of "dysthymic disorder" presently does not significantly interfere with her overall functioning. Claimant mentioned that she does not feel depression would substantially interfere with employment but that her allowed physical conditions prevented her from employment.
 {¶ 34} 15. On August 10, 2001, relator, through counsel, deposed Dr. Berg. The deposition was recorded and transcribed for the record.
 {¶ 35} 16. Following a September 28, 2001 hearing, an SHO issued an order denying relator's PTD application filed on May 14, 1996. The SHO's order finds that relator is able to return to her former position of employment as a bus driver based upon the reports of Drs. Hannington, Valle and Berg. The SHO's order presents a lengthy discussion of Dr. Berg's narrative report, his occupational activity assessment report and his deposition.
 {¶ 36} 17. On May 8, 2002, the commission mailed an order denying relator's motion for reconsideration.
 {¶ 37} 18. On July 22, 2005, relator, Cynthia Light, filed this mandamus action.
Conclusions of Law:
 {¶ 38} The main issue is whether Dr. Berg's reports and deposition constitute some evidence upon which the commission can rely to determine that the dysthymic disorder permits relator to return to her former position of employment as a bus driver.
 {¶ 39} Equivocal medical opinions are not evidence. State exrel. Eberhardt v. Flxible Corp. (1994), 70 Ohio St.3d 649, 657. Equivocation occurs when a doctor repudiates an earlier opinion, renders contradictory or uncertain opinions, or fails to clarify an ambiguous statement. Id.
 {¶ 40} A medical report can be so internally inconsistent that it cannot be some evidence supporting a commission decision.State ex rel. Lopez v. Indus. Comm. (1994), 69 Ohio St.3d 445;State ex rel. Taylor v. Indus. Comm. (1995), 71 Ohio St.3d 582,585.
 {¶ 41} Citing Eberhardt, Lopez and Taylor, relator argues that Dr. Berg's opinions must be eliminated from evidentiary consideration. The magistrate disagrees.
 {¶ 42} Relator's argument is essentially an invitation for this court to reweigh Dr. Berg's report and deposition for the commission. This court must decline the invitation.
 {¶ 43} Relator argues:
The opinion that the claimant had a "mild impairment" to acquire new job skills is in itself vague and ambiguous, as well as internally inconsistent with the rest of Dr. Berg's assessment. Dr. Berg stated that her ability to cope with routine job stress was mildly impaired by her psychological condition in addition to her feelings of depression due to her physical pain[.] * * * The report was vague and ambiguous as it did not specifically express to what quantity a mild impairment would result. Dr. Berg did not do a precise evaluation as to the extent of her impairment[.] * * * On the issue of her crying episodes, he did not ask her specifically about how often the spells were occurring and made no further inquiry into their existence[.] * * * During his deposition the following exchange occurred between Dr. Berg and counsel for the Relator:
Q. You also indicated that the claimant mentioned that she will cry if she becomes frustrated. Is that a symptom that is consistent with a dysthymic disorder, to have crying spells upon being frustrated?
A. Yes[.]
Q. Then you indicate, from what she relates, it does not appear that she has frequent episodes of crying. This gets us to the question, what's frequent? I guess that's different to different people. Did you specifically inquire as to how often she had these?
A. I can't remember — usually I do. I can't remember if I did or not. But frequently to me, to me would mean more than a couple of times a week. And I didn't feel that applied.
Q. Because I noted you reviewed the report of Dr. Howard — and I'll just tell you that Dr. Howard in his report at one point indicated when he saw her that she had crying spells approximately every two days and that that was consistent with dysthymic disorder. I guess I'm wondering, is every two days consistent with your report or was yours more frequent, less frequent or don't you really know.
A. I can't recall but I'm sure it was less frequent than that.
Q. But you don't have any way of knowing exactly?
A. No.
Q. You didn't specifically inquire as to how often; is that correct?
A. I can't recall but, see, I didn't put it in the report.
Q. Okay. Well, I guess that kind of goes to two separate things. You can't recall if you asked it; as you sit here today, you can't specifically recall asking her that?
A. No, no.
Q. And if it's not in your report, you don't have any other basis to know whether you did?
A. No[.] * * *
Dr. Berg based his opinion that the Relator did not suffer from frequent crying spells on non-existent evidence. He did not question her about the frequency during his examination, and in his report he simply stated "it does not appear that she has frequent crying episodes[.]" * * * How is this to be determined if there is no inquiry into their occurrence? It is not prudent to rely on Dr. Berg's opinion when he did not address the issue in his examination[.] * * *
Similar issues arise with the Relator's propensity to fall asleep. Dr. Berg made no additional inquires into the frequency or length of time the Relator would be in a sleeping state. During the deposition of Dr. Berg, the following exchange occurred:
Q. Did she indicate to you — and I realize that all this quantification is somewhat difficult but you have in there she mentioned that she often dozes off. Did she go into further detail with you as to how often, how long? Did she quantify that in any way other than often dozes off?
A. What page?
Q. I'm sorry, page three under Examination and Discussion, the last sentence of the first paragraph under Examination and Discussion.
A. Okay. No. I didn't go into detail.
Q. Okay. I mean —
A. She didn't act as though it were a significant problem.
Q. Okay. In your notes — you don't have any knowledge or estimate as to how often that would occur; is that right?
A. No, no.
Q. Okay[.] * * *
Dr. Berg again based his opinion on non-existent evidence. He did not question her about the frequency during his examination * * * and did not inquire further as to how much "often" was, or what "almost all of the time" entailed[.] * * * Dr. Berg later, however, in his deposition, stated that the dozing off would impair her ability to work during specific times.
Dr. Berg noted that due to the dysthymic disorder the claimant had trouble with drowsiness, fatigue, and sleeping which caused her to often "doze off[.]" * * * He testified that if the claimant were to fall asleep in the work setting, most obviously, it would impair her ability to work[.] * * * During these periods of time when she was asleep she would not be able to drive a school bus or assist the children, so it would definitely impair her ability to work during that specific time and could put her and the children on the bus in danger. These times that she would be unable to work were not consistent with the opinion that she could return to her former position of employment.
Dr. Berg also testified in his deposition that the claimant would cry if she became frustrated[.] * * * Dr. Berg stated that during these periods of time when she was having crying episodes, it would impair her ability to work due to the fact that she would be unable to work during those specific times[.] * * * The evidence of the crying episodes and her dozing off seemed to contradict Dr. Berg's opinion that the Relator could return to her previous position of employment.
One would think there would be more than just a mild impairment when someone suffers from crying episodes from periods of frustration, dozing on the job, and depression that resulted in periods where she was completely unable to work.
* * * In the case at bar, the Staff Hearing Officer partially relied on the report and deposition of Dr. Berg to determine that the Relator could return to her former position of employment or perform other types of sustained remunerative employment. * * * However, after a reading of Dr. Berg's report and deposition, it is clear the Staff Hearing Officer's reliance on the report was contrary to law[.] * * *
(Relator's brief, at 13-17.)
 {¶ 44} The magistrate disagrees with relator's argument as quoted above.
 {¶ 45} In his narrative report, Dr. Berg states: "The claimant mentioned that she will cry if she becomes frustrated. From what she related it does not appear that she hasfrequent episodes of crying." (Emphasis added.)
 {¶ 46} During the deposition, relator's counsel questioned Dr. Berg to obtain a more precise meaning of "frequent." Dr. Berg stated that, to him, frequent means "more than a couple of times a week." Dr. Berg could not recall that he specifically asked relator during the examination how many times per week she has a crying episode.
 {¶ 47} Because Dr. Berg could not recall his discussion with relator regarding the frequency of the crying episodes, relator concludes here that Dr. Berg's opinion that relator did not suffer from frequent crying episodes is based upon "non-existent evidence." The magistrate disagrees.
 {¶ 48} Relator is suggesting that the evidentiary value of a medical report fades away as its author's memory of the examination fades over time. Yet, one of the purposes for reducing the medical examination to a written report is to preserve that which over time will probably be forgotten or, at best, recalled without accuracy. After all, relator's counsel deposed Dr. Berg some four months after the examination.
 {¶ 49} Dr. Berg's inability to recall details of the examination that support his written observations or conclusions goes to the weight of the evidence contained in the written report. It does not destroy the evidentiary value as a matter of law, as relator seems to suggest here.
 {¶ 50} Even if it can be argued that it would have been better for Dr. Berg to have questioned relator in more detail as to the frequency of her crying episodes, that again only goes to the weight of the written evidence which is for the commission to determine. Undisputedly, the SHO reviewed the deposition, but determined that Dr. Berg's reports were credible and worth placing reliance upon.
 {¶ 51} It is important to note that Dr. Berg did not, at his deposition, repudiate his written finding that relator's crying episodes are infrequent. While Dr. Berg stated that he could not recall his conversation with relator at the examination regarding the frequency of her crying episodes, he was, nevertheless, "sure" that it was less frequent than the every two days suggested by relator's counsel. Relator's counsel was unable to obtain a repudiation from Dr. Berg at the deposition.
 {¶ 52} The same analysis applies to relator's argument that the evidentiary value of Dr. Berg's report is destroyed by his failing to go into further detail regarding relator's mention that she "often dozes off."
 {¶ 53} To the extent that it can be argued that it would have been preferable for Dr. Berg to have questioned relator about the frequency of her dozing off and recorded her answers in his report, that again goes to the weight to be given by the adjudicator to the report. This court will not reweigh Dr. Berg's report for the commission in a mandamus action.
 {¶ 54} Based upon the foregoing analysis, the magistrate concludes that Dr. Berg's reports are indeed some evidence supporting the commission's determination that the dysthymic disorder permits relator to return to her former position of employment as a bus driver.
 {¶ 55} The magistrate notes briefly that relator has also argued that Dr. Berg's reports must be removed from evidentiary consideration because allegedly they are similar to Dr. Howard's report which this court previously eliminated from evidentiary consideration in the prior mandamus action. This argument lacks any legal basis and is clearly inappropriate. Clearly, the evidentiary value of Dr. Berg's reports are in no way dependent upon any perceived similarity or dissimilarity with Dr. Howard's report.
 {¶ 56} Relator puts forth another argument that the magistrate shall briefly address. According to relator, the commission, through its SHO's order of August 28, 1998, rejected the report of Dr. Valle. Citing State ex rel. Zamora v. Indus.Comm. (1989), 45 Ohio St.3d 17, relator claims that it was, thus, improper for the commission to rely upon the report in its SHO's order of September 28, 2001. The magistrate disagrees.
 {¶ 57} Zamora's holding was summarized in State ex rel.Jeep Corp. v. Indus. Comm. (1992), 64 Ohio St.3d 378, 380-381:
* * * Zamora * * * prohibits the commission from relying on a medical report that the commission had earlier found unpersuasive. In Zamora, the claimant simultaneously applied to have an additional psychiatric allowance and to have himself declared permanently totally disabled. The claimant was examined by various specialists, including Dr. Dennis W. Kogut, who stated that the claimant's depression preceded his industrial injury and that the contribution of the industrial injury to the depression was minimal.
The commission allowed the psychiatric condition and, in so doing, implicitly rejected [Dr.] Kogut's report. However, ten months later, the commission denied the application for permanent total disability based partially on Dr. Kogut's same narrative. The claimant challenged the commission's subsequent reliance on that report, arguing that once rejected, the report was removed from evidentiary consideration. We agreed.
 {¶ 58} The Zamora rule is inapplicable to the commission's reliance upon Dr. Valle's report for two reasons. First, the SHO's order of August 28, 1998, did not reject Dr. Valle's report. To the contrary, the SHO's order of August 28, 1998, expressly states reliance upon that report. Second, the SHO's order of August 28, 1998, has been vacated pursuant to this court's writ of mandamus.
 {¶ 59} In short, the commission did not abuse its discretion by relying upon Dr. Valle's report to deny relator's PTD application.
 {¶ 60} Accordingly, for all the above reasons, it is the magistrate's decision that this court deny relator's request for a writ of mandamus.
 /s/Kenneth W. Macke
KENNETH W. MACKE MAGISTRATE
[1] The SHO rejected Dr. Valle's proposition that relator was permanently disabled as a result of chronic pain syndrome on the grounds that chronic pain syndrome was a non-allowed condition. However, the SHO relied upon the remainder of Dr. Valle's report to deny relator PTD compensation.
[2] Dr. Berg noted in his report that "[c]laimant mentioned that she does not feel depression would substantially interfere with employment but that her allowed physical conditions prevents her from employment."
[3] We note that relator strongly objects to Dr. Berg's failure to explain how she can return to her former position as a bus driver with her current limitations. Such explanation is irrelevant in the action herein, because relator's claim is for PTD, not TTD compensation. There must only be some evidence that relator is unable to perform sustained remunerative employment to support denial of PTD compensation.